THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* ZOILO NIEVES SANTANA, Defendant and Appellant.

No. 8312.—Argued November 14, 1940.—Decided December 19, 1940.

770

Diego E. Ramos and Buenaventura Esteves for appellant. George A. Malcolm, Attorney General, and R. A. Gómez, Prosecuting Attorney, for appellee.

Mr. Chief Justice Del Toro delivered the opinion of the court.

The District Attorney of Arecibo brought an information against Zoilo Nieves, charging him with the crime of murder in the first degree, committed on the person of Pascual Nieves Camacho, in Utuado, on June 17, 1937.

The defendant pleaded not guilty and asked for a jury trial. The trial was held in April 1939, and the jury returned a verdict of guilty of voluntary manslaughter. After a new trial had been requested and refused, the court, in May following, rendered judgment sentencing the defendant to seven years' imprisonment in the penitentiary at hard labor.

Feeling aggrieved by that judgment, Zoilo Nieves brought the present appeal, and in his brief he has assigned ten errors committed, as he claims, by the court in allowing the district attorney to change the designation of the offense; in permitting the witness Angelino Alvarez to testify as to the statements made by the deceased several hours before the occurrence; in permitting the witness Juan B. Molina to testify as to immaterial facts; in unduly interfering with the examination of witnesses; in prohibiting the defense from introducing in evidence certain records of proceedings for declaration of heirship and for judicial administration; in refusing to give certain instructions to the jury, and in giving others; and in denying the motion for a new trial.

It seems advisable to begin by analyzing the evidence which served as a basis for the verdict. After that analysis we will be in a better position to consider and determine the assignments of error.

The first witness to testify was Dr. Miguel Peregrina. He made a *post-mortem* examination of the body of Pascual Nieves. The latter exhibited three bullet wounds: a slight one in the forehead; another, serious but not fatal, in the mouth; and still another which was necessarily fatal, piercing the aorta and the lower lobe of the left lung. The internal hemorrhage must have been a violent one, and death must have ensued one or two minutes after the third wound was inflicted.

He stated that he had been called to treat a lady who was supposed to have swallowed poison. He arrived at the house when there was a very great excitement. He went into the room, examined the patient, and ordered that she be removed to the hospital, as he realized the gravity of the case. That was at about eleven o'clock in the evening of June 16, 1937. At the hospital he attended her until half past two or three o'clock in the morning. When he came out of the room he met the young man Armindo Nieves, who asked him whether his mother was out of danger. He answered that he re-

gretted to tell him that it was a hopeless case, and then entered his office in order to give some instructions to the nurse. Two or three minutes afterward he heard several shots, but he was unable to determine how many or whether the intervals between them were of the same duration. Shortly thereafter the janitor came in and handed to him two revolvers which he kept. He shut the door. He had the police called. Pascual Nieves, who, he thinks was the husband of the patient, asked him to try to save her, and not to worry about the money—as if wishing to encourage him. Some of the relatives went to the hospital; among them he saw the defendant at first; later he did not see him; the defendant was not the one who had asked him about the condition of the patient.

Casimira Nieves, known as Camila, married, twenty-one years of age, a sister of the defendant, upon being called to testify, stated that she had learned of the death of her parents through the newspapers, while she was in New York. She came to Puerto Rico and went to live in the house that had belonged to her parents, where some of her brothers were, including the defendant. Next day while she was in her room praying for her deceased mother, her brother the defendant, told her "that when my mother took poison he called my brother Armindo and told him that if the latter did not kill my father he would do it himself, and said that if my father killed him, he would kill my father . . . When Zoilo said this, Mindo told him that if my father killed him, Mindo, then Zoilo should kill my father, and as they agreed to this, Mindo went on to the place and he stayed behind but watching the other's steps, and when Mindo entered the place where my father was, giving him a revolver, he arrived in a little while, and when he arrived he found his father on top of Armindo, about to strike him, and as my father was a strong man, with one hand he seized my father's hand as he struck and with the other he shot at him and killed him; that the last shot was the one that killed him and that he had fired it."

Upon being cross-examined as to whether she had any quarrel with her brother, the defendant, over a small café, she answered in the negative; as to whether she had any interest in having her brother convicted so that her hereditary share should be increased, she also answered in the negative; when asked to explain to the jury why she had waited over five months after her brother's confession before reporting it to the district attorney, she answered: "Because he did not want me to tell the truth, and he was always quarreling with me . . . he threatened to strike me, as he did not wish that I should tell the truth, and I could not permit this, and I did it and told the truth"; it was insisted that she should explain how "was it possible that a man who was ready to object and did object tenaciously, even to the extent of threatening and striking her, if she went to denounce him, should spontaneously make those statements," and the witness answered: "He went out of the house, and then I came here and told the district attorney, and when I returned to my house he was not there; and he became angry and he was going to beat me and when he was about to strike me the chief heard the words: I killed my father, and just like I killed my father I will kill you between now and this afternoon."

The defense stated that the witness had not understood its question, and asked it anew. The witness answered, reasserting that the defendant had made the confession. The defense insisted again, and thereupon the court intervened, thus: "I think that is rather argumentative, as she could not explain that attitude of his. She could testify as to facts, and if the latter are improbable she might explain them, by her comments; but she could not explain the motives which he had." Roberto Edwin Nieves was the next witness. He is a boy twelve years of age. He stated that when his poisoned mother was taken to the hospital, he went there with his father and while both of them were in the room with her, his brother Mindo came in "with two revolvers, and he gave one to his father and said: 'Take this and defend yourself,'

and father grabbed the revolver and when he opened it the cartridges fell down, and then Mindo fired two shots. I got under the bed. I continued to look and saw my father jump on him, and Mindo fired another shot and missed and I went out of the hospital.'' He saw the defendant as the latter came riding on a bicycle near the hospital, and after seeing him he heard another shot.

Angelino Hernández, a corporal of the Insular Police, stated that on the night of the occurrence the defendant's father told him that he wished to take his wife, who was poisoned, out of the house in order to have aid administered to her, and that his sons, armed with revolvers, objected to this; that the witness told him that that was not a matter for the police, that he should see the judge. That he afterward decided to go to the house and saw the car in which the patient was being taken to the hospital. He went to the hospital and saw the defendant and his brother Armindo Nieves ''pacing in front while the physician gave medical aid to the lady, and the father was inside.''

Aracelio Figueroa, an insular policeman, testified that on June 17, 1937, he was on duty at the Headquarters in Utuado, and at about half-past one o'clock the policeman Molina brought in Armindo Nieves, arrested for murder, and his brother Zoilo asked permission to talk to him. The witness granted it and Zoilo talked in a whisper with Armindo for about two minutes and told him that he was going to get bondsmen for him, and Armindo answered that he did not want them.

Juan B. Molina, the policeman who took Armindo to police headquarters, deposed that at about two o'clock in the morning he went to the hospital, as he learned that something had happened there, and approaching the place he met the brothers Armindo and Zoilo Nieves.

The district attorney then offered in evidence a written statement by the defendant. Counsel for the latter asked for ten minutes in which to examine it, and at the end of

that period they said: "We do not object to its admission, and we adopt that statement as ours." It was admitted. It is long and confused. It had been executed before the district attorney, on June 23, 1939. From it we take the following:

". . . on the night of June 17, 1937 . . . Armindo told me: 'You stay taking care of the house' . . . and while he was on the street but in front of the house . . . he saw Armindo coming out of the shop . . . and he went to overtake him . . . as I went up I met the telegraph operator who was coming down, the lady, the sister of the operator, they told me that Mindo was going there, that if I hurried I would overtake him, and although I did my best I could not overtake him, then, when the shots were heard I was nearing the front steps of the hospital . . . I stopped in the middle of the room . . . everything had already occurred . . . my brother was underneath, pressed against the cupboard in the hall, and father was on top; then I saw that my brother had a revolver as if pointing it upward; I jumped at him and snatched the revolver from him, and then my father who had his arm behind him fell backwards; I took the revolvers away from them and put them on the table; Plumilla came in shortly afterward and my brother gave him the two revolvers . . . and then he handed them over to Doctor Peregrina.—Q. Are you sure that your father had a revolver at that moment?—A. Yes, sir. —Q. Loaded or unloaded?—A. I did not notice.—Q. Had your brother a revolver also?—A. Yes, sir.—Q. Was your brother underneath and your father on top?—A. Yes, sir.—Q. Had your father subdued him?—A. I suppose so, because he was underneath.—Q. Were they struggling, or not?—A. Yes, struggling."

When asked whether or not he had confessed being the one who had fired the last shot, he answered in the negative.

In regard to the poisoning of her mother and the attitude assumed by Armindo and himself respecting the father, he testified thus:

Q. Did you talk to Armindo before he left for the hospital?—A. Yes, sir.—Q. Where?—A. At the shop.—Q. What did you talk about? —A. I asked him what had father told him the day before, as mother was crying; because father called Mindo aside and told him something; and my mother was listening and she did not dare to tell me

and was crying; then I went to Mindo. 'What has he told you, Mindo?'—'Nothing, I have nothing to tell you.' Then next day, when mother took the poison, I said to him: 'Mindo, you think that I am not a man; I can keep a secret; so you are going to tell me what father told you'; then he said: 'I am going to tell you, but don't tell anyone; you go away from the house; that they would sell the house; that mother had been unfaithful to him.' Then I said: 'Gee, that is an awful thing; a lady who never leaves her home, never goes' out, has no opportunity; that she had gone out twice to my aunt's house and had gone with Roberto Edwin and had returned on the same day, and that she went to the house of father's brother, to his sister's; so it must be a lie; I don't believe it.' Then he told me: 'Well, all right.'"

He denied having plotted with his brother the death of the father.

The evidence of the district attorney closed with the introduction of that document. That of the defendant opened with the testimony of Iraida Medina, a nurse who attended Mrs. Nieves when the latter was brought to the hospital. She stated that she had heard the shots but that she could not tell whether they were in succession, one after the other. She did not know who had killed Don Pascual Nieves nor who had fired shots.

Vicenta Villalba, an assistant nurse, stated that she saw the defendant at the hospital when they brought his mother there, poisoned. During the tragedy she did not see him. He must have come about five minutes afterward. She was reaching the hospital kitchen when she heard the shots. They seemed continuous to her.

Inocencio Montalvo stated that the defendant had a small café, which Camila Nieves entered in order to provoke him, telling him to get out from there, and that the defendant answered that she should go upstairs to attend to her household duties, and then she spat on his face. Asked as to whether the sister had threatened the defendant, he answered: "She told him that he was going to send him to jail, and Zoilo said: 'She would have to prove whether she has any evidence to

send me to jail.' '' Upon being questioned by the district attorney he answered that a daughter of his was married to the defendant.

Camila Nieves was then called by the defense. As it attempted to put leading questions to her, the court prevented this and the defendant took an exception. Then the witness answered that she had contracted marriage eight or nine months previously. She has eight brothers. When she returned to the Island, Zoilo was operating the small café. When Zoilo was arrested the small café ceased to exist. She did not take charge of it. She visited the defendant at the jail several times. She did not offer to get counsel to represent him, nor did she tell him that she had not repented. She was not repentant. She learned that a declaration of heirship was being prosecuted. When she was asked about a certain judicial administration, the district attorney admitted that when a proceeding for the judicial administration of the estate of the parents of the witness was instituted by the latter's elder sister, the witness appeared in order to oppose the same, at his suggestion, and he objected to any further questioning as being irrelevant and not matter of defense. The court sustained the objection and the defense took an exception. The defense then attempted to introduce the original records of the declaration of heirship and judicial administration proceedings and of the prosecution instituted against the defendant's brother, Armindo. The court stated that the way to do this was by producing certified copies, and thereupon the defense took an exception.

Upon Juan Soto Afanador being called to testify, he stated that in June 1937, he was an employee of the Utuado hospital and on the night between the 16th and the 17th of that month the wife of don Pascual Nieves was carried to the hospital, suffering from poisoning. The lady died the same night. While he was in the kitchen of the hospital, he heard a shot. There were several, but he could not give a precise account of the others. Armindo handed two revolvers to him for

him to deliver to the police and to say that he had killed his father. He saw Armindo and Zoilo together.

Polidor Santiago, a prison guard, first saw the defendant in jail and also his sisters who visited him, either jointly or separately, carrying fruit and sweets to him. He did not hear what they talked about.

Higinio González, a prison guard like the preceding witness, testified similarly.

Armindo Nieves, now confined in the Insular Penitentiary, stated that his mother's name was Emilia Santiago Ortega; that he pleaded guilty and was convicted of the crime of murder in the second degree, committed on the person of Pascual Nieves, his father, on June 17, 1937, in a room of the Municipal Hospital of Utuado. Answering the question asked by the defense: "To what was your action due?", he said:

"Your Honor, gentlemen of the jury, attorneys, and officers of the Court: You have before you a member of a family who has been stricken by a most terrible tragedy . . . Well, the circumstances or motives which moved this defendant are of such a deep character and involve such psychological aspects that this defendant does not feel capable of explaining to the court and to the members of the jury the extent to which those motives could have induced him to commit a crime of such a character . . . The gravity lies in . . . that there was involved the death·of my dear mother, and this defendant believes that the motives which induced him to commit violence were aroused by my dear father, and the situation which affected all the members of our family, the great nervous tension, (hearing) the cries of agony, nature itself must have been shaken, and this defendant lost all control of himself . . . I seized some weapons . . . Two . . . A Colt revolver and one of the Smith kind . . . I went to the hospital . . . I went absolutely alone . . . I handed one of the weapons to my father and I kept the other one . . . Then I said . . . that I expected either to be killed by him or to kill him and taking the weapon, he being ready to fire, I fired also . . . He pushed at me and we fell down and he fell clinging to me . . ."

He continued to testify thus:

"Q. What participation did this defendant, Zoilo Nieves, have in those events which you have related to us?—A. None whatever.— Q. The only thing he did was to enter, take you or pull you out from underneath and seize the weapons and hand them over, you placing them on a chair, and then go out with you?—A. Yes, sir.—Q. Did he at any time have an opportunity to shoot at your father?—A. No, sir.—Q. Nor did he hold you back or take away the revolver from you?—A. He did not, either.—Q. Did your brother fire a shot at any time?—A. At no time."

The cross-examination was more extensive. From it we copy the following:

"Q. Do you recall whether you opened the revolver and the cartridges came off?—A . . . I remember that I opened it to see whether it was loaded and then I shut it back.—Q. Did the cartridges come off?—A. I can not tell precisely as to that. If I had noticed that the cartridges had come off I would not have fired— . . .—Q. And did you fire?—A. Yes, sir.—Q. Immediately?—A. Yes, sir.— Q. When?—A. After a minute.—Q. Did it take you one minute to fire the first shot?—A. I took some time.—Q. What for?—A. To give him time.—Q. Time for what?—A. In order that he could do the same as I did, defend himself.—Q. So that you wanted to give him time to kill you?—A. Yes, sir.—Q. Did he not fire?—A. He had no time.—Q. Now, which is it; you wanted to give him time to shoot, but he had no time?—A. The instinct of self-preservation asserted itself. . . .—Q. Did you fire the first shot at him while he was standing?—A. Yes, sir.—Q. And what did he do then?—A. He plunged forward.—Q. Towards you?—A. Yes, sir.—Q. Did you grab him?— . . .—Q. Where were you at that moment?—A. Inside the hospital.—Q. In the room where your mother and your father were? —A. Yes, sir.—Q. Did you stay there during all the time of the shooting or did you move elsewhere?—A. We moved towards the outside.—Q. Struggling?—A. Yes, sir.—Q. Did you go beyond the door?—A. Yes, sir . . .—Q. Did you struggle in the hall?—A. Yes, sir.—Q. When did you fire the second shot?—A. In the same room.— Q. And the third one?—A. Right there . . .—Q. And are you sure that you did not fire any in the hall?—A. I did not.—Q. So that after your father received the shots that you had fired at him, he grappled with you and both went out of the room, crossed the hall and fell, he on top of you?—A. Yes, sir."

Upon being called, Leocadia Nieves, a sister of the defendant, testified that her sister Camila was in possession of the estate left by their parents—a house "which according to the best appraisers in Utuado may be worth two thousand dollars"; that she asked to be appointed administratrix of the estate and the judge provisionally appointed Camila; that the latter refused to give her accommodation in the house; that "afterwards she came quite excited, to tell me that she begged my forgiveness, as I had been like a mother to her, and asked me to accompany her to see Zoilo"; that they went to see him at the jail and while there Camila told him; "Zoilo, I am sorry that I have turned you over to the authorities and I am ready to help and to get you a lawyer"; that she acted that way, impulsively . . . Sometimes she asked to be forgiven and other times she does not, I do not know why.

Julio Suárez Garriga, district attorney, testified that he had filed the information against Armindo Nieves for the murder of Pascual Nieves, charging him with having inflicted three wounds on Pascual which were the same ones charged as against Zoilo in the information which he subsequently brought against the latter. At the time of the filing of the information against Armindo "I had suggestive or circumstantial evidence incriminating Zoilo Nieves, and after Camila Nieves made her statements I had not only circumstantial but also direct evidence. In other words, if I had proceeded against Zoilo Nieves he would have been released on *habeas corpus,* because the circumstantial evidence was not sufficient to make out a case, which evidence was afterwards completed by the confession that he made to his sister and by his subsequent statements before me, corroborating said confession in all its parts except as to the fact of his having fired."

It was announced by the defense that it had closed its evidence and by the district attorney that he had further evidence to introduce in rebuttal. He called Camila Nieves who, answering his questions, stated: that she had not visited the defendant, her brother, in the jail accompanied by her sister

Leocadia, nor begged the former's pardon at any time, nor promised to get a lawyer for him; that she saw said sister only once, in the office of the district attorney, when the former asked her to vacate immediately one of the rooms and she answered that she could not do so, that she had to wait until one of the persons who occupied it should leave, that she was in charge of the house and could not do it at the moment; that she feeds and clothes a younger brother.

Such, in short, is the evidence in this case, which is truly an extraordinary one in the criminal annals of our Island.

. We shall now examine the errors assigned. As we have already stated, they are ten in number. We shall discuss them in the same order in which they have been stated and argued by the appellant in his brief.

By the first it is maintained that the court erred in allowing the district attorney over the objection of the defendant, to reduce the designation of the offense from murder in the first degree to murder in the second degree by a mere verbal announcement made after the trial had commenced. In arguing this assignment, the defendant in his brief says:

"We do not challenge the right which the district attorney has to reduce the designation of an offense from murder in the first degree to murder in the second degree, for this would clearly benefit the defendant and the latter cannot and should not complain of such reduction. What we challenge and condemn is the procedure followed in this case which in our judgment constitutes a grave deviation from justice and legal order. The action of a prosecuting attorney in announcing with the leave of court, after the trial has already begun and over the emphatic protest of the defendant, 'that he is going to prosecute the case as for murder in the second degree,' when the information has not been amended and contains all the elements of the crime of murder in the first degree, is, in our judgment, a fatal procedure, since the document which he is to submit as he did in this case, to the consideration of the jury and which the latter takes into their consultation room, is the original information drawn for murder in the first degree. 30 C. J. 116."

What the record shows is that, upon the case being called for trial, the parties stated that they were ready and the dis-

trict attorney said: ''I announce that I am going to prosecute
the case as for murder in the second degree.'' The informa-
tion had been filed charging murder in the first degree. The
defense objected on the ground that it was deprived of a cer-
tain number of peremptory challenges, and the court ruled:
''The court denies the motion, as the impanelling of the jury
has not yet begun and the district attorney, before trial or
even at the commencement of the trial, has the right to reduce
the designation in the information, although he is not entitled
to prosecute for another offense or for a higher offense but
he can for a lower degree, because this is for the benefit of
the defendant.''

The defense took an exception. The formation of the jury
was proceeded with and at the conclusion thereof, the district
attorney said: ''I accept the jury,'' and the defense added:
''I also accept the jury.''

Upon the resumption of the trial next day, the defense
renewed its objection and stated that a further ground there-
for was that the procedure followed had been an irregular
one, as the proper thing was that the district attorney, with
leave of the court, should have filed a new information in
order that the defendant might have had an opportunity to
set up his objections to the same.

The court then instructed the jury, thus:

''The court instructs the jury and states for the record, that the
district attorney can reduce the charge in the form he did in this
case, because only the reduction to a lower degree is involved and
the defendant is not prejudiced in any way, the only difference being
that in a case of first degree murder the district attorney will have
to prove deliberation, whilst in that of second degree murder he will
have to prove premeditated malice. As that reduction in the charge
favors the defendant, and as the latter was prepared to defend him-
self not only against a charge of premeditation but also against one
of deliberation, there is no prejudice, and it is an ordinary occur-
rence in the American courts to make such reduction before the trial.
Therefore, the court wishes to instruct you that, in its judgment,
there is no error.''

The citation from Corpus Juris contained in the brief does not specifically set forth anything to support the contention of the defendant. We do not think that it was necessary to file a new information. The degree having been reduced, the crime was included in the offense charged, and if no objection was made to the information as originally filed, with less reason could any be made to it in its reduced form. As to the number of challenges, it will be remembered that the defense finally and expressly accepted the jury as formed.

In the absence of any specific citation of law or jurisprudence to the contrary, and no prejudice to the defendant having been shown, we hold that there was no error and that if any existed it was harmless.

■ The second assignment is that the court erred in permitting the witness for the prosecution, Angelino Álvarez, over the objection of the defendant, to testify as to statements made by the deceased some hours before the occurrence, without it having been shown that the accused had heard those statements.

We have examined the whole of the testimony objected to, pages 50–58 of the transcript, and it may perfectly be inferred therefrom that the statements of the deceased to the witness were heard or could have been heard by the defendant. This assignment of error must therefore totally collapse.

■ The third assignment lacks importance. It is based on the ground that the witness J. B. Molina was permitted to testify as to immaterial facts. His testimony was really unimportant. In brief, it was confined to placing the defendant and his brother Armindo near the hospital where the crime was committed, on the night when the same was perpetrated. There was no error, and if there was any, it caused no prejudice.

■ The fourth and fifth assignments are argued jointly. By them the trial court is charged with partiality and prejudice "in prohibiting the defense from interrogating Camila

Nieves'' and in ''unduly interfering with the examination of the witnesses.''

Regarding the first point, what appears from the record —pages 90 and 91—is that after the defense had called Camila Nieves as its own witness, upon certain leading questions being put to her, the court intervened and told defense counsel that he could not continue in that course. The defense took an exception against ''the conduct of the case'' based on the doctrine laid down in *People* v. *Acevedo,* 35 P.R.R. 886, thus:

''Though the trial judge, in the exercise of his discretion, may take part in the examination of the witnesses, he should do so in such manner as to impress the jury with the fact that he is entirely impartial.''

Perhaps the court should have waited until the district attorney objected. However, it was so manifest that the defense had begun to conduct the examination in an improper way that the intervention of the court was only natural, logical, and required by the attendant circumstances. For that reason, and as no partiality or prejudice can be inferred from its action, we do not think that the error, if any, is prejudicial.

■ As to the undue interference by the court in the examination of the witnesses, after examining the entire transcript of the evidence we do not think that the court exceeded its powers at any time.

■ By the eighth assignment it is maintained that the court erred in giving to the jury the following instruction:

''You may believe a witness, a portion of his testimony and not believe another portion, if you think that in part he told the truth and in part he lied. Formerly, when a witness falsified a part of his testimony no credit was given to the remaining portion thereof. The modern tendency is that sometimes when a man testifies he tells the truth in part and falsifies in part. The difficulty is not to be able to determine when he told the truth and when he falsified.''

The appellant cites the third subdivision of section 162 of the Law of Evidence (section 524 of the Code of Civil Procedure, 1933 ed.) which says:

"A witness false in one part of his testimony is to be distrusted in others."

This provision has not the scope which the appellant attributes to it. When a witness is false in one part of his testimony, he is *to be distrusted* in the remaining portion of the same; but this does not mean that that portion should be rejected in its entirety. The jury must act with caution knowing that they are not treading on firm ground, but if, in the exercise of their discretion, they are convinced that the rest of the testimony is true, they may take it into consideration when rendering their verdict.

The appellant himself ends the argument under this asignment with the following citation:

"The maxim, '*falsus in uno, falsus in omnibus,*' is not to be construed as authorizing a Court to charge that if a witness perjures himself in respect to one or more particulars, the jury must reject all his testimony." *People* v. *Sprague*, 53 Cal. 491, 494.

There was no error. The instruction complained of is in accord with the law and the jurisprudence on the subject to which it refers.

▮ By the ninth assignment it is charged that the court erred in instructing the jury as follows:

"I am giving instructions on manslaughter in this case, because the evidence of the district attorney as well as that of the defendant established that the defendant arrived at a time when a fight was in progress. If the defendant when entering the hospital did not have the intention to kill his father, but saw the fight there and intervened in it and fired, then, Gentlemen of the Jury, if that killing was unlawful, it was manslaughter, provided it was without malice and had no justification. If he fired and by reason of the shots the father, being alive, was killed by them and by those shots which he had already received, you could return a verdict, because it might be manslaughter, if you believe that it has been proven, if you reach that conclusion, not merely searching for another crime on the basis of a supposition, but on what you think that actually occurred."

Citation is made of jurisprudence established by this court, thus:

"The fact that a minor crime is included in a major crime alleged in an accusation does not justify a judge in giving instructions in regard to the minor crime unless there is some evidence which may serve as a basis for a verdict finding the accused guilty of said minor crime. *Held*: That in the present case such evidence does not exist." *People* v. *Andino*, 55 P.R.R. 68.

There was no error. Contrary to what happened in the cited case, in the present one there is evidence in the record to justify the instruction.

In the seventh assignment the question is raised as to the instructions refused.

The record shows that defendant submitted to the court a written statement containing seven long instructions to be delivered to the jury.

The court first said:

"The court directs that this request for instructions be attached to the record for the purpose of an appeal, because the court is going to refuse the same, as it thinks that for the most part they have already been given and in part they can not be given in the form requested."

Then it added:

"The court will not give these instructions to the jury because some of them are included in those which it has already given, and others would tend to confuse the jury as they are erroneous in certain parts."

Were we to transcribe the requested instructions and discuss them one by one, it would unnecessarily extend this opinion which is already too lengthy. It will suffice to say that from the examination we have made we find that the action of the trial court was justified. In its own instructions it extensively covers the entire field of the facts and the law, and although the instructions which were requested and refused contained acceptable principles, they are all so drawn that they produce a confusion or tend unduly to favor the

defendant. In these circumstances, we think that the court acted correctly in refusing to give them.

There only remain to be considered the sixth and tenth assignments which are jointly argued in the brief. By them it is charged that the lower court erred in "prohibiting the defense from introducing in evidence the records of the civil cases of the declaration of heirship and judicial administration relative to the persons and property of the defendant's parents" and "in denying the motion for a new trial."

In summarizing the evidence we already had occasion to refer to the incident giving rise to the sixth assignment. We think, indeed, that the court erred in not admitting the originals of the records in question as such, requiring instead copies of the same. Did it thereby prejudice the rights of the defendant? Let us see.

All that the appellant says in his brief as to the connection between the records and the case is as follows:

"Our object in attempting to introduce said evidence was to impeach the veracity of the witness Camila Nieves and to leave established the interest of the latter in having her brother, Zoilo Nieves, appellant herein, convicted of a crime which she had invented for the sole purpose of causing his aforesaid brother to be disinherited under the provision contained in section 830 of the Civil Code (1911 ed.), since in this manner the hereditary share pertaining to said witness would be increased."

Those records have not been brought before this court. They should have been sent up as evidence offered and rejected, in order that we might determine for ourselves as to their importance. Although the district attorney failed to act in the clear and precise manner that he should have acted, the truth is that when the attempt was made to introduce the records in evidence, he said: "I object because that is not evidence of any defense."

Moreover, by reason of the questions put to Camila and Leocadia Nieves, of the admissions of the district attorney, and of the statements and suggestions of defense, the jurors

were informed of everything that the defense wished them to show regarding the matter.

Lastly, although the court erred in not allowing the introduction of the original records, the fact is that it gave the defense an opportunity to introduce copies of the same, by ordering a recess and announcing that if the certificates were requested it would direct the clerk to issue them immediately, to which the defense answered: "We announce that we are not going to request any."

From all the foregoing it may be seen that it is now sought to inflate a purely formal error which really has no importance in order to demand the reversal of the judgment. As we are not convinced that the defendant has suffered the slightest prejudice, we shall not accede to that demand.

Of the various grounds set forth in the motion for a new trial, the fifth only is specially discussed, and it relates to the sufficiency of the evidence. The others have been discussed and decided against the defendant in passing upon the corresponding errors assigned as a basis for the appeal.

We think that the evidence is sufficient. This is a strange and extraordinary case, of extreme gravity. It involves persons of impetuous temper, whose statements must be received and judged with caution. Camila Nieves, who acquainted the jury with the defendant's confession, was believed by them, and she could be so believed because her testimony, although of an exceptional character, can not be rejected as improbable.

The conduct of the defendant and the manner in which he described to his sister his intervention in the perpetration of the crime, are in accord with the rest of the evidence which connects him with the same; and his subsequent refusal to acknowledge his confession and the attitude of his brother, already convicted, in assuming full responsibility are perfectly understandable. When the defendant spoke to his sister he did so spontaneously, certainly without measuring the consequences of his words. Afterwards, when he fully

realized those consequences, his reaction is not illogical. As to the convicted brother, does it not seem natural that, having already been sentenced, he should try to save the defendant?

It is also perfectly understandable that Camila should have hesitated before communicating to the authorities the confidential disclosure made by her brother. She acted as a tortured soul who finally solves a disturbing conflict of conscience by following the path of truth. What indeed seems untenable is that she should fabricate a confession of such tremendous significance as the one she stated first to the district attorney and then firmly maintained before the court, whereby his brother would be tried for parricide, with the sole purpose of increasing by one-sixth of one-eighth her share in an estate, the whole value of which amounted to about two thousand dollars.

Twelve jurors unanimously believed her; they weighed her testimony and considered that the same, when added to the remaining portion of the evidence, required a verdict of guilty, which they rendered. A competent judge, the same one who conducted the proceedings at the trial and who had an opportunity to see and hear the witnesses testify, denied the application for a new trial, as he considered the evidence to be sufficient. No substantial error of law has been committed. In these circumstances, the verdict, the order, and the judgment should stand.

The appeal must be overruled and the judgment appealed from affirmed.